Forsyth *v.* Forsyth.

---

JESSE M. FORSYTH et al.

*v.*

GEORGE W. FORSYTH.

1. Where a testator first makes a gift of land, and subsequently revokes such gift and directs that the land shall be sold, and then disposes of the proceeds in a certain way, the subject of the gift in such a case is money, and not land.

2. Where a gift is limited over, to take effect in case two things occur, the gift over will not take effect if only one of the two occurs, as, for example, a gift limited over to a child in case its father becomes a drunkard and a vagabond, will not take effect if the father becomes a drunkard, but does not become a vagabond.

On final hearing on bill and answer and proofs taken before a master.

*Mr. William E. Skinner,* for the complainants.

*Mr. Theodore Little,* for the defendant.

Van Fleet, V. C.

The parties to this suit are the five children of William W. Forsyth, who died on the 1st day of March, 1872. Four join in asking the aid of the court against the fifth. The subject of the suit is two hundred and one acres of land, situate in the township of Mendham, in the county of Morris. The complainants seek to have these lands divided among themselves and the defendant. The defendant denies the complainants' right to a partition. His position before the court is, that the lands were the property of William W. Forsyth, and, as he died testate, the lands, by force of a devise contained in his will, passed to himself and his co-executor. It is admitted that, if the lands were the property of William W. Forsyth, the complainants cannot maintain this action. The question whether or not the complainants can maintain this action, must be decided by the construction which shall be given to the will of George Forsyth. He died in April, 1830. His will speaks of William W. Forsyth as his son. There is no evidence showing that he had any other child, nor, indeed, is there any evidence showing that William was born in wedlock. There is no proof that George Forsyth was ever married. He died seized of the lands which are the subject of this suit. An inspection of his will shows, beyond doubt, that he intended to dispose of them by his will, but he has expressed his intention in that regard with so much verbosity and ambiguity as to render the construction of his will a task of some difficulty.

The provisions of the will of George Forsyth, pertinent to the question to be decided, and which are set out in the complainants' bill as the foundation of their right to the aid they ask, are very lengthy. I have made more than one attempt to make an

abridgment of them, sufficiently extended to present everything necessary to be considered in deciding what construction they should receive, and thus save the necessity of quoting them *in extenso*, but I find I cannot do it. In consequence of the verbose and confused manner in which the testator has expressed himself, I have come to the conclusion that it is necessary, in order to ascertain his probable meaning, that all the provisions of his will, relating to William, should be set forth almost literally. The testamentary papers consist of a will and four codicils. Quotations need only be made from the will and first codicil. The will bears date August 26th, 1826, and the first codicil was executed fourteen days afterwards, namely, on the 9th of September, 1826. William was born on the 21st day of June, 1809, and was, at the date of the will, and also at the date of the first codicil, between seventeen and eighteen years of age. The provisions of the will bearing on the question in hand read as follows :

"*Fifthly.* All the remainder of my real estate, to wit," [here nine parcels are designated by name,] "together with any other lands and premises, not herein mentioned, any one of which places, such as my son William W. Forsyth shall make choice of, I hereby give, grant and devise to my son William W. Forsyth, his heirs and assigns forever; and in case he should make, in addition to the choice above mentioned, to retain the house and lot where I now dwell, joining the Cary orchard, and also the Cary orchard, I hereby give, grant and devise the said two lots to my son William, his heirs and assigns forever."

The will then directs the delivery of ten bushels of apples yearly to Rebecca Paine, and gives the testator's pew in the Mendham meeting house to William, and then says:

" But in case my son William shall not choose any of the land, nor to live in the country, then I do hereby authorize and direct my executors to sell and dispose the same real estate, as well as what I have given him choice of as of all the other as well before named, and any other not mentioned, either by public or private sale, such as they shall judge best, and grant deeds and conveyances for them, and also leases, if necessary ; and after paying all my just debts, funeral expenses and expenses of a common headstone for myself, * * * together with the different bequests by me made, and the real estate so devised to my son, provided he shall make choice of any ;

·if so, or not so, all the remainder of my estate I give and bequeath unto my son William in the following manner, that is to say: the interest of the balance of my estate to be put out at interest on freehold security, but not upon a second mortgage, or upon premises where there is a prior lien, and the said interest appropriated to the use of my son William, towards his board, clothing, schooling and such necessaries as he may require or stand in need of, until he arrives at the age of twenty-one years; at which time I do hereby order my executors to pay to him one third of the capital sum, or balance then remaining, to enable him to put himself in some lawful way of doing business to make a living. But in case he shall make a choice of the premises, or any of them before mentioned, then I do hereby order and direct my executors to advance and pay my son such sum of money as they shall deem necessary to purchase stock and others that may be wanting for said farm, together with one year's provisions in order to set him fairly agoing with said farm. If he ·should make a good use of that third for two years, which my executors are to judge of, or in the eyes of provident and careful men, I do hereby order my executors, at the end of said two years, to pay to my son one third more, and if it shall still appear that my son makes a good use of the two payments, so made to him, for three years after the last two years, at which time I do hereby order my executors to pay to my son William the remaining third. The interest of each third to be paid to him yearly. But in case my son William shall not make a good use of the first, but becomes a drunkard and a vagabond, like many others, then my express will is, that the remaining two last thirds of my estate, so bequeathed to him as aforesaid, shall remain at interest on freehold security, secured in the way and manner before described, which interest shall be paid to him yearly during his natural life. But in case my son shall have a wife and family, and act in manner aforesaid, then I order my executors to apply the interest of the money aforesaid towards the ·support of my son and his family—what shall be considered for their necessary ·use—and the remaining principal sum to be applied to the use of his child or ·children, after his decease, equally, share and share alike, if any he may so have—which child or children of my son shall be bound to maintain and ·clothe the mother while she remains the widow of my son, but no longer. And in case my son should die before he is of lawful age, or without being married and having lawful issue, then my will is, that the residue of my estate, together with what real estate he may so choose as aforesaid, shall remain at interest, and also at a yearly rent, which is to be paid yearly and each year to my sister, Johnston Thomas, during all the days of her natural life, and at her decease, the capital sum, and whatever real estate may then be remaining,"

are ordered to be divided among the testator's brother and sisters. The will then says:·

" In order that no misunderstanding takes place when my son William is to ·make his election of the lands he may choose, if any, it is to be at the age of twenty-one years, the premises to be rented out until that time, and the rents -applied to his use as before directed."

By the codicil, made fourteen days after the date of the will, the testator says :

"I hereby revoke and disannul my devise to my son, William W. Forsyth, of my lands as stated and mentioned in my will aforesaid, and in lieu and instead thereof, I order and direct and authorize my executors to grant, bargain, sell or lease the same, and the proceeds thereof (which may be invested in stock of the United States Bank, or loaned on freehold security, at the discretion of my executors) to be disposed of and appropriated for the use of my son William as is in and by my said will directed."

The codicil, it will be seen, revokes the devise made by the will to William, and directs that the land which the will gave him shall be sold. The revocation of the gift of the land is made in language so plain as to place the testator's meaning, in that respect, beyond doubt. It is almost equally as clear, when the main design of the codicil is considered, that it was the testator's intention to order an out and out conversion of all his lands ; that is, that he meant that his lands should be changed from land to money, so that the person who should be entitled to his residuary estate, whether it was William or others, should take money, and not land. It is true, there is coupled with the power to sell a power to lease—they are given in the disjunctive—to sell or lease—but the words which immediately follow the grant of power, namely, "the proceeds thereof   *   *   * to be disposed of and appropriated for the use of my son, as is in and by my will directed," render it pretty clear, as I think, that the power, which the testator considered the primary one, was the power to sell, and that he meant that this should be the only power which should be exercised, unless his executors found that an advantageous sale could not be made, and in that case they might lease until such time as an advantageous sale could be made. That the testator meant that the land, which is the subject of this suit, should be converted into money, and the money realized from its sale should be one of the things which his will should pass, is, I think, made so plain, when his will and codicil are read together, as to leave his meaning in that regard substantially free from doubt. The conversion which the testator directed to be made has never been made. That, how-

-ever, cannot change the course which the property must take, in its devolution, under the will, nor will it have the slightest effect in changing the rights of the person or persons who, by the true construction of the will, may appear to be entitled to the property. The land must now be given to the same persons who, if a conversion had been made, would be entitled to the money.

As already stated, the testator died in April, 1830. William attained his majority on the 21st day of June following, and was married in April, 1831. Soon after his marriage he took possession of one hundred and eighty-eight acres of the land now in dispute, and four or five years afterward took possession of the balance. He remained in possession continuously up to the time of his death, in March, 1872. His dominion over the land, so far as management was concerned, was complete. He used it as he saw fit; took the whole of its produce, and made such disposition of it as he thought proper; he repaired buildings already erected, built new ones and reclaimed waste land, and paid the whole cost of these changes and improvements out of his own funds; he paid no rent; the executors never, so far as the proofs show, attempted to exercise the power of a landlord over him, nor to require him to perform the duties of a tenant. The proofs of both sides concur in showing that the land, while in William's possession, was very greatly improved in fertility and value. But these things shed no light on the main question, and are without importance, except as they may serve to suggest a reason why the conversion directed by the will was not made.

The question on which the decision of the case must turn is, what does the will of George Forsyth give his son William? For the reasons already given, the property set apart by the will for the use of William must, so far as the subject-matter of this suit is concerned, be regarded as money. This, according to my view, is an important fact, and should, in any attempt to discover the testator's meaning respecting his son, be constantly kept in mind. There can be no doubt, I think, that the testator meant to set apart the whole of his residuary estate for the use of William. By his will he said:

"After paying all my just debts, funeral expenses and the expenses of a com-- mon headstone for myself,   *   *   *   together with the different bequests by me made, and the real estate so devised to my son, provided he shall make- choice of any, if so, or not so, all the remainder of my estate I give and be- queath to my son William in the following manner."

The phrase, " all the remainder of my estate," used in this. sentence, when construed in connection with the direction con- tained in the codicil, that all the land devised to William should be converted into money, must unquestionably be held to em-- brace the whole of his residuary estate—all that should remain after his debts, funeral expenses, the cost of a headstone and the bequests made by his will were paid. The will, in describing the manner in which William should have the use of the tes-- tator's residuary estate, then says :

"The interest of the balance of my estate" [evidently meaning all the re- mainder of his estate,] "to be put out at interest on freehold security,   *   *   * and the interest appropriated to the use of my son William, towards his board, clothing, schooling and such necessaries as he may require,   *   *   *   until. he arrives at the age of twenty-one years; at which time I do hereby order my executors to pay to him one third of the capital sum or balance then remain- ing, to enable him to put himself in some lawful way of doing business to make a living."

Reading the words " one third of the capital sum or the bal-- ance then remaining " in the light of the direction for conversion- contained in the codicil, it would seem to be tolerably clear that they mean one third of the testator's whole residuary estate,. no matter of what it may consist, whether it is wholly capital or principal, or is in part made up of interest which accrued during- William's minority, but remained unappropriated to his use.

The next provision authorized the executors, in case William. elected to take the testator's farm, to advance sufficient money to- him " to set him fairly agoing with the farm," but this authority was, of course, revoked by the revocation of the devise to Wil- liam. Then follows the clause which has the most direct and decisive bearing on the question now under consideration. It reads as follows :

Forsyth *v.* Forsyth.

"If he" [William] "should make a good use of that third for two years, which my executors are to judge of, or in the eyes of provident and careful men, I do hereby order my executors, at the end of said two years, to pay to my son one third more, and if it shall still appear that my son makes a good use of the two payments, so made to him, for three years after the last two years, at which time I do hereby order my executors to pay my son William the remaining third. The interest of each third to be paid to him yearly. But in case my son William shall not make a good use of the first, but becomes a drunkard and a vagabond, like many others, then my express will is, that the remaining last two thirds of my estate, so bequeathed to him, shall remain at interest on freehold security,   *   *   *   which interest shall be paid to him yearly during his natural life. But in case my son shall have a wife and family, and act in manner aforesaid, then I do order my executors to apply the interest of the money aforesaid towards the support of my son and his family, *   *   *   and the remaining principal sum to be applied to the use of his child or children, after his decease, equally, share and share alike."

The will then gives direction as to what shall be done with the testator's residuary estate in case William should die before he is of age, or without being married and having issue. As neither of these events occurred, it is unnecessary to give any attention to this part of the will, except to say that the estate limited over is described in these words: "The residue of my estate, together with what real estate he" [William] "may so choose as aforesaid."

That the testator meant that William should take one third of his whole residuary estate, absolutely, when he became of age, is, I think, entirely certain. His will says, that when William attains the age of twenty-one years his executors shall pay him "one third of the capital sum or balance then remaining." The testator evidently meant that the one-third of his whole residuary estate should pass. That such was his meaning is put beyond all doubt by the language which he uses when he comes to direct what shall be done with that part of his estate which is not to be paid to William in case he does not make a good use of the first third, but becomes a drunkard and a vagabond. In that event, he says:

"My express will is, that the remaining last two thirds of my estate, so bequeathed to him, shall remain at interest,   *   *   *   which interest shall be paid to him yearly during his natural life."

In this respect I do not think the testator's meaning is subject to the least doubt. On the contrary, I think it is perfectly plain that he meant that William should, on attaining his majority, become entitled to the one third of his whole residuary estate absolutely. And it is equally plain, in my judgment, that the testator meant that William should take the other two thirds also, unless, in the judgment of his executors, William failed, for two years, from the time of the payment of the first third, to make a good use of the first third, and became both a drunkard and a vagabond. As I read the will, the executors could only withhold "the remaining last two thirds" provided three things co-existed, namely, that William had failed, for two years, to make a good use of the first third ; that during that two years, or before, William had become a drunkard and also a vagabond. In other words, to extinguish William's right, it was necessary that he should not only have failed to make a good use of the first third and to have become a drunkard, but that he should also have become a vagabond.

Owing to the somewhat incongruous or eccentric manner in which the testator has expressed himself, this, perhaps, is not the interpretation which would be given to the will on a hasty or incautious reading of it, but it is the only interpretation which can, I think, be given to it when all its provisions, pertinent to the question in hand, are attentively considered. If, in trying to find out the testator's meaning, we should look at nothing but his direction as to when and under what circumstances the last two thirds were to be paid, it must be admitted that the result above stated could not be reached, for his direction in that regard, stated in substance, is, that the last two thirds are not to be paid unless William had made a good use of the money previously paid. But, it is important to keep in mind, that the testator has not as yet directed what should be done with the balance of his estate in the event that William should not have made a good use of the money previously paid to him. He does, however, give such direction in the next sentence, and the next sentence is the one which, I think, expresses the testator's leading wish, and furnishes, in all probability, the highest attainable

·evidence as to what his purposes were with respect to the disposition of the remaining two thirds of his residuary estate. He ·says in that sentence :

"But in case my son William shall not make a good use of the first" [third], "but becomes a drunkard and a vagabond, like many others, then my ·express will is, that the remaining last two thirds of my estate, so bequeathed to him, shall remain at interest, * * * which interest shall be paid to him ·yearly during his natural life. But in case my son shall have a wife and family, and act in manner aforesaid," [that is, become a drunkard and a vagabond,] " then I do order my executors to apply the interest of the money aforesaid towards the support of my son and his family, * * * and the remaining principal to be applied to the use of his child or children, after his ·decease, equally, share and share alike."

One thing, I think, stands out perfectly clear on the face of this sentence, and that is, that the testator did not mean that William's children should take anything under his will unless William became, before the last third became payable, both a ·drunkard and a vagabond. The limitation over to William's ·child or children is only to take effect, as I think the will plainly says, in the event that William becomes both a drunkard and a vagabond. The two words describe entirely distinct characters. A man may be a drunkard and not a vagabond, and so he may be a vagabond and not a drunkard. According to my construction of the will, to take away William's right and to raise a right in favor of his children, it was not enough that William had not made a good use of the money paid to him under the will, nor that he had become a drunkard, but he must also have become a vagabond. All the events on which the limitation over depended must, from the very nature of the gift over, happen, before the rights of the first taker would be divested so as to allow the substituted legatees to step in the place ·of the primary legatee.

There is no evidence in the case which will support a finding that the complainants' father ever became a vagabond. This makes it unnecessary to decide whether or not he became a ·drunkard. There was some discussion on the argument as to the sense in which the testator meant that the word " vagabond "

should be understood. I think it is quite probable that he did not use it in the sense in which it is ordinarily understood, namely, as descriptive of a vagrant or homeless wanderer, without means of honest livelihood, but rather that he used it to describe an idle, worthless, improvident fellow, who is so utterly without moral sense or self-respect that he will neither provide for his family nor take proper care of himself. That provision of the will in which the testator says, " But in case my son shall have a wife and family, and act in manner aforesaid, then I do order my executors to apply the interest of the money aforesaid towards the support of my son and his family," serves to show, quite forcibly, I think, that the word was used in the latter sense. But, taking that to be the sense in which the testator meant that it should be understood, still it must be declared that there is no proof before the court which would support a judgment that the complainants' father was, at any time during his life, a vagabond. The testator manifestly intended to submit the determination of that question, in the first instance, to the judgment of his executors. Their conduct shows that they did decide it. They allowed the complainants' father, almost immediately on his attaining his majority, to take possession of the lands which are the subject of this suit, and to continue in possession of them, managing them in his own way and appropriating their produce to his own use, all the days of their lives. This, it is obvious, they would not have done, if, in their judgment, he had been a vagabond. But I think it ought, in addition, to be said, that the proofs, in my judgment, conclusively show that the complainants' father never was, in any sense of the word, a vagabond. Nor is there any evidence in the case which would justify a finding that the property which the executors passed over to him was not well and providently used. The proofs, on the contrary, I think, show that he made a good use of it.

The lands, which are the subject of this suit, represent, in my judgment, property which by the will of George Forsyth passed to his son William. The complainants, consequently, have no right to have them partitioned, and their bill, therefore, must be dismissed, with costs.